Demio, J.
 

 The first question to be determined relates to the construction of the constitutional provision imposing personal liability upon the stockholders of banks
 
 (Const., art.
 
 8, § 7) ; and the inquiry is whether it is limited to banks thereafter to be created, or applies equally to existing banking corporations. There is nothing in the language which looks to a discrimination between the two classes. It declares, generally, that the stockholders in every corporation and joint-stock association for banking purposes, issuing bank notes, after January 1,1850, shall be individually responsible, &c. If We look to the apparent object of the provision, no motive can be discovered for confining its operation to future' banks. The intention was to protect more adequately the creditors of these institutions, and to take from their proprietors, to a qualified extent, the shield afforded by the corporate personality in which their individual ownership was merged. There were strong reasons for the establishment of a uniform system in this respect, if it could be
 
 *12
 
 done without manifest injustice. The existing banks were numerous, and if they were exempted from the principle of personal liability, it would be a long time before it would be generally established. By the general banking law, the associations had the power to prescribe for -themselves the duration of their corporate existence, and a long term had generally been named. Hence, if the rule of personal liability only reached the case of future banks, there would continue to be two classes of banking institutions for many years to come. The defendant’s counsel insists that we should not construe the clause so as to disturb vested interests, unless compelled by language which would not admit of any other meaning. But we are not to interpret the Constitution precisely as we would an act of the Legislature. The Convention was not obliged, like the legislative bodies, to look carefully to the preservation of vested rights. It was competent to deal, subject to ratification by the people, and to the Constitution of the Federal Government, with all private and social rights, and with all the existing laws and institutions of the State. If the Convention had so willed, and the people had concurred, all former charters and. grants, might havfe been annihilated. When, therefore, we are seeking for the true construction of a- constitutional provision, we are constantly to bear in mind that its authors were not executing a delegated authority, limited by other constitutional restraints, but are to look upon them as the founders of a State, intent only upon establishing such principles as seemed best calculated to produce good government and promote the public happiness, at the expense of any and all existing institutions which might stand in their way. The rule laid down in
 
 Dash
 
 v.
 
 Van Kleck
 
 (7 John., 477), and other cases of that class, by which the courts are admonished to avoid, if possible, such an interpretation as would give a statute a retrospective operation, have but a limited application, if any, to the construction of a Constitution. When, therefore, we read in the provision under consideration, that the stockholders of every banking corporation shall be. subject to a certain liability, we are to attribute to the la iguage its natural meaning, without inquiring whether
 
 *13
 
 private interests may not be prejudiced by such a sweeping mandate. But, independent of this consideration, there is enough on the face of the provision to show that it .was intended to apply to all banks of issue, which should be, in existence three years after the Constitution should take effect, without regard to the time when they were created. The individual responsibility was applied only to banks which should issue bank notes or some kind of paper credits to circulate as money after the 1st day of January, 1850, and only to such debts of those banks as should be contracted after that day. The delay was apparently afforded in order to enable the proprietors of existing banking institutions to determine whether they would remain banks of issue, and assume the burden of individual liability, or avoid that consequence by winding up their affairs, or confining themselves to other branches of banking. It is impossible to suggest any other motive for postponing the operation of the provision. If the existing banks were to be exempt from its influence during the continuance of their charters, no delay would be needed on their account; and as to future banks to be organized under general laws, their proprietors would embark in the business with a full knowledge of its hazards and responsibilities, and hence would not require any time to accommodate themselves to it, and would have no reason to complain of the sudden change of policy. If, therefore, it were doubtful, upon the general language of the provision, whether the banks already established were intended to be embraced, the postponement of its operation for three years, for no conceivable motive but their convenience, would show very clearly that they were intended to be. brought within its scope at the expiration of that period. If we look into the proceedings of the Constitutional Convention, we shall find the most authentic evidence that the actual intention of its members was such as I have supposed. It appears that while the article in which the provision is found was under consideration, Mr. Kirkland, a member from Oneida county, moved to amend it, so as to confine the individual liability to corporations and associations
 
 *14
 
 thereafter to be formed; but the amendment, after considerable debate, was negatived. (Debates, Argus ed., 664-666.)
 

 ■ But the position most strongly relied upon by the appellants’ counsel is, that the. provision, if valid, would operate to impair the obligation of a contract; and hence that it is a violation of the Constitution of the United States. Upon this branch of the case, certain principles have been established by the Federal Supreme Court, and are no longer subjects of controversy. That court having paramount jurisdiction upon questions arising under the Constitution of the United States, we have only to ascertain what has been distinctly determined by it, and to apply those doctrines to the case before us. Thus it has been adjudged that an executed grant is as fully within the constitutional protection as an executory agreement. Hence, a conveyance which takes effect to transfer a title by the delivery of the instrument, cannot be revoked or impaired by State legislation.
 
 (Fletcher
 
 v. Peck, 6 Cranch, 87, 136-139.) Then the provision is not limited to dealings between individuals, but extends equally to contracts between the State sovereignties and private parties: nor, in respect to contracts to which the State is a party, is it confined to such as relate to definite pecuniary obligations or to specific real or personal property. It embraces charters and grants of corporate powers and privileges, when conferred for private and pecuniary objects.
 
 (Dartmouth College
 
 v.
 
 Woodward,
 
 4 Wheat., 518;
 
 Green
 
 v.
 
 Biddle,
 
 8 id., 2;
 
 Gorden
 
 v.
 
 The Appeal Tax Court,
 
 3 How., 133;
 
 State Bank of Ohio
 
 v.
 
 Knoop,
 
 16 id., 369;
 
 Dodge
 
 v.
 
 Woolsey,
 
 18 id., 331.) And it also applies to corporations created under general laws. Such statutes are. considered as propositions extended to private citizens; and when they are accepted, and a corporation has been organized pursuant to their provisions, a contract between the State and the private adventurers is created, which is equally inviolable as the terms of a charter granted by special statute. In the case of
 
 State Bank
 
 v.
 
 Knoop,
 
 just referred to, a provision in the general banking law of Ohio prescribing a tax of six per cent of the profits of the banks formed under it, in lieu of all. taxes
 
 *15
 
 to which it or the stockholders would otherwise be subject, was held to be a, contract against further taxation, which was within the protection of the Constitution. It follows from these adjudications that if the general banking law of this State had not contained any reservation of a right to repeal or change it, the associations organized pursuant to its provisions would have been the proprietors of franchises held under contracts with the State, which would have been beyond the reach of legislation.
 

 It has also been held by the Supreme Court, that the change of a State Constitution can no more operate to abrogate or essentially change a contract of this character, than an ordinary act of legislation. In
 
 Dodge
 
 v.
 
 Woolsey (supra),
 
 the Legislature of Ohio had, in 1845, chartered a bank called the Commercial Branch Bank of Cleveland, with a provision for limited taxation. By the amended Constitution of that State, adopted in 1851, it was declared that all property employed in banking, whether by banks then existing or thereafter to be created, should always bear a burden of taxation equal to that imposed upon the property of individuals. A stockholder of the bank filed a bill in the Circuit Court of the United States against the officers of the State, whose duty .it was to collect a tax assessed under a State law passed in pursuance of the Constitution; and a decree was made, perpetually enjoining the collection of the tax, which was affirmed by the Supreme Court. The court said that a change of Constitution could not release a State from contracts made under a Constitution which permitted them to be made. These decisions of a tribunal which is entitled to sit in review of our judgments upon questions arising under the Federal Constitution, must necessarily be binding on us. We are not at liberty to inquire whether they do not impose restraints upon the State sovereignties, not within the contemplation of the authors of the Constitution of the United States, whatever might be our opinion if the question were open to our consideration.
 

 The question before us is, therefore, narrowed to a consideration of the effect of the provision in the general banldng law
 
 *16
 
 by which the right is in terms reserved to the Legislature to alter or repeal it at any time. (Laws of 1888, 253, § 82.) This, according to one view, is the reservation of a right only to change or repeal it, prospectively, from the passage of the modifying or repealing law, so that the associations which had been organized in the meantime would remain unaffected by such modification or repeal. On the other hand, it is insisted that it enabled the Legislature to deal with the associations as though they were directly established by a statute containing in itself the usual reservation. I am of opinion that the latter is the correct view. By the Revised Statutes, the charter of every corporation thereafter to be granted by the Legislature, was declared to be subject to alteration, suspension or repeal, in the discretion of the Legislature. (1 R. S., 600, § 8.) This provision incorporated itself into and became part of every special charter which was itself silent as to the power of repeal or change. But notwithstanding this, and out of abundant caution, all the bank charters, and I believe all the other acts of incorporation subsequently passed, contained a standing section reserving the power to repeal or change them. Prior to . the passage of the general banking law, corporations, with a few unimportant exceptions,, were created by special laws. Hence the legislation referred to was indicative of a settled policy in the Legislature to make the grant of corporate franchises revocable; and if we are to construe the banking law with a certain reference to that policy, we must hold that thé reservation embraced the corporations which might be created as the subjects of change or repeal, as well as the act itself. - This intendment becomes stronger when we consider that the statute, as a general law, was equally capable of being prospectively changed or repealed as any other law in the statute book, though there had been no reservation of a power of repeal. Had there been, therefore, no reservation in the act, the Legislar turc would not have been chargeable with interfering with a contractor a vested right, had it repealed the statute prospectively, by declaring that no more corporations should be formed, or that such as should thereafter -be organized should subject the aaso
 
 *17
 
 ciates to unlimited personal responsibility. The clause, therefore, meant something more than the reservation of a right to interfere with the act prospectively. But again, the business of the banking associations assumed and required the continued existence of the act; for the State officers were to cooperate with the associates in the fabrication of circulating notes. The Comptroller was the depositary of the securities which were to be furnished. (§§ 1, 2.) The repeal of the act would take away the powers of these officers, without the exercise of which the banks could not continue their business.
 

 From these considerations, I am led to the conclusion that the effect of the clause in question was to reserve to the Legislature the same power over the corporations created under the act, which was contemplated by the provision of the Revised Statutes,, which has been referred to, and by the standing clause contained in special -charters granted since 1830, in respect to corporations created by special law. Moreover, I think this precise question has been in effect, decided in this court. In 1847, the Legislature passed an act authorizing the formation of corporations to construct and operate plankroads. The corporations were to be created by the subscribing and filing of articles of association, and there was a reservation to the Legislature of the right to alter, amend or repeal the act. (Laws of 1847, ch. 210.) There was also a right reserved to annul or repeal any corporation created under the act; but none, in terms, to alter or amend the corporation. The Schenectady and Saratoga Plankroad Company was organized under this act in 1848, and the defendant became a subscriber to the stock. Afterwards, in 1849, an act was passed, by which plankroad companies were authorized, on certain conditions, to construct branches to their main line, or extend it, and increase their capital for that purpose. (Laws of 1849, ch. 250.) In an action against a defendant on his subscription, he set up that the directors had availed themselves of the act of 1849, by increasing the capital stock and constructing a branch road without his consent. This he contended released him from his subscription by changing the contract. But we held that the-defend
 
 *18
 
 ant made Ms subscription subject to the contingency that the Legislature might change the act, by an amendment by virtue of the power reserved to alter or amend it.
 
 (Schenectady and Saratoga Plankroad Co.
 
 v. Thatcher, 1 Kern., 102.)
 

 I do not perceive that a corporation created under a general law, like the banking act or the plankroad act, differs essentially in respect to the point we are considering, from one orgamzed under a special statute, which does -not,
 
 ipso
 
 facto, create a corporation. Nearly all the charters of recent corporations are simply enabling acts. Commissioners are named to open books for subscription to the stock, and to distribute it among the subscribers in case of an excess of subscription: then an election of directors is to take place, and the company is to go into operation. The charters usually close with a section declaring that the Legislature may at any time alter or repeal the act. A corporation is thus brought into existence by performing the acts pointed out by the statute; but as it is not created by the act itself, but only authorized to be created by the voluntary acts of' others, the power to alter or repeal the act is not, in strictness of language, an authority to interfere with a corporation duly created according to its provisions. The case appears to me entirely parallel with those of corporations formed under general laws; yet it has always been considered that the reservation enabled .the Legislature to act directly upon the corporation. In
 
 The Buffalo and New York City Railroad Company
 
 v.
 
 Dudley
 
 (4 Kern., 336), the question was whether the alteration by the Legislature of the constitution of a railroad corporation, by changing its name, increasing its capital and extending its road lme, discharged the defendant from his liability on a subscription to its stock; and it was held that it did not. The act under which it was incorporated was such an enabling one as has been mentioned, and the reservation was of a right to alter or repeal the act. (Laws of 1845, ch. 336.) This court held that the amendmg act was witMn the power reserved.
 

 Upon the whole, I am satisfied that the legislative contract between the State and the associates in" this bank, contained in
 
 *19
 
 itself a provision which saved and reserved to the Legislature the right to withdraw the franchises granted or to modify them at its pleasure.'
 

 But it is argued that they could not be revoked or altered-by a change of the Constitution, even if it could be done by the Legislature. We have seen that the Supreme Court of the-United States has held that a State constitutional provision, acting prejudicially upon a contract, is a law passed by a State impairing its obligation, within the inhibition' of the Federal Constitution. This is upon the ground that the substance of the provision is, that the State shall not interfere in any way, with the rights which citizens have acquired by contract. It may be said with equal reason, and without any greater departure from the strict meaning of language, that the reservation contained in the laws under which corporations are formed, looks to a revocation of the franchises by any legal act which shall possess the force of law, though not strictly an act of legislation. But it is unnecessary to rely upon- this answer to the argument. The act of 1849, under which this proceeding was commenced, adds the legislative sanction—if any were necessary—to the mandate of the Constitution; for it declares the liability of the stockholders to the same extent and under the same circumstances. The right reserved in the general banking law has therefore been exercised in the precise manner indicated by its language.
 

 It is argued that because the act left it to the election of the stockholders to determine whether they would embark in the business upon the footing of personal liability, or upon that" of corporate liability only, and they declared by the articles that they would not incur any individual responsibility, a private contract was established which was beyond the influence .of the clause allowing a modification or repeal of the act. It is not in ■ the power of the associates, by any stipulations inserted in their articles of association, to limit the power of the Legislature under the reservation contained in the act. These associations originally had the power to issue negotiable paper, -payable on ■time, .upon proper occasion, provided it was not of. a character
 
 *20
 
 to- circulate' as money. In 1840-, the Legislature passed an. ace making it unlawful'to issue any such paper, unless it should be payable on demand. Suppose the articles had expressly provided that the- 'associations should have the right to issue slibh'time- paper; no one, I' presume, could' doubt but that the act' would éffectually take away that power, though it was allowed' by express stipulation in the articles.
 

 It "might be safely admitted that neither the people in their Constitution nor the Legislature could convert a debt which, a the time it Was contracted bound no- one but the corporation,. ihtd the "private debt of the stockholders. But this has not been attempted. Hone of the debts owing before the Constitution took effect, nor any of those which were contracted Within - three -years' afterwards, are charged upon the stockholders. Thé'power of the corporation to contract at all whs a corporate franchise; and subject to the control of the Legislature by force of the reservation.. They might wholly annihilate the power to' contract'by repealing the act, or continue it, subject .to such conditions' or’ restrictions as they saw fit to impose. Where a party- has a discretion to prohibit an act altogether if he considers it best for his own interest, he is never hound absolutely and unconditionally to forbid it. He may' allow it on such condition's as he stipposés may' be consistent with his interests. What the Legislature did was, to continue the power to contract upon the corporate credit alone, on condition that the association would relinquish the faculty of issuing á paper currency 1 after January-1, 1850; and to declare that if it should elect to remain' a bank of issue after that, day, it should not incur debts on the sole credit of the corporation; but it might in that event continue-'to máke contracts after that day, upon the corporate Credit-, 'With-a limited personal responsibility superadded. The association eleeted'to retain the faculty' of "issuing bank notes, ■ and thereby voluntarily1 assumed, so far ‘as it was.competent to do'-'it,'-in--behalf Of1 its Stockholders, the individual liability attached to itS'Cdhtracts by the'Cdnstitution and the act of 1849.
 

 •But ibis Said'that1 the corporation could not, by any act or omission of '-its own,1 implicate:' its stockholders in- a liability
 
 *21
 
 which they had not consented to assume, and which, on the contrary, they had declared they would not incur. But they had voluntarily consented to become stockholders upon the conditions held out by the general banking law. One of these conditions was that the Legislature might amend and alter the act, and in that way change and modify the constitution of the corporation. A change under this reservation to alter Bright render their investment more or less profitable, and their position more or less hazardous. Whatever peril it entailed they consented to assume. Stockholders cannot put in the plea
 
 non hcec in federa veni;
 
 for, although they have not by a direct act' become parties' to the contracts of the association, they have conferred powers upon others to contract, to a limited extent,, in their behalf. In the first place, they have empowered the1 corporation to affect their individual' interests to the extent of the corporate authority, and then they have agreed that the corporate power may be changed by the Legislature. That change might operate by way of restriction or extension. In fact it was materially enlarged. Originally the acts of the corporation could only affect the shareholders to the amount of their contributions to the capital stock, but by the enlargement of its powers it was enabled to make contracts which might call for a further contribution of an equal amount. The super-added liability is as clearly within their contract as that incurred in the first instance; for it has been incurred, according to the terms of an arrangement to which they were parties. In the two cases referred to from Kernan’s Reports, the defendants insisted that they had never contracted to embark their money in the enterprises which were being actually prosecuted by the directors; but the answer which this court gave was that they had voluntarily embarked their credit in corporations, whose-* powers were liable to be enlarged by the Legislature.
 

 It is further argued that the appellants, supposing them to hold only the minor part of the stock of the association, had’ no means of embracing the alternative held out ,by the constitutional provision and the act of 1849, of abandoning the business of. issuing bank notes. This may be true; but it is the same
 
 *22
 
 disability which attaches to every stockholder in a corporation, who cannot control a majority of the stock. The direction may do acts which he wholly disapproves, but, as many persons have found to their cost, he is utterly powerless to arrest the proceedings of the governing authority. Whether the power which is exercised originally belonged to the corporation or has been superimposed by competent authority, his liability for its acts is of the same character.
 

 The power of a State Legislature to impose personal liability upon the stockholders of a corporation for debts created subsequently to the passage of the act prescribing the liability, has been affirmed by the Supreme Court of Maine.
 
 (Stanley
 
 v. Stanley, 13 Shepley, 191.) A manufacturing company was chartered in 1833. There was a prior act passed in 1831, declaring that the Legislature might alter or repeal any act of incorporation. In 1839 an act was passed making the stockholders in corporations chartered after 1831, personally liable for debts contracted after the act of 1839. The company incurred a debt in 1841, and the plaintiff subsequently purchased stock in the corporation, and his property was taken on an execution against the company; that being the mode, in that State, of enforcing the personal liability of stockholders. In an action of trespass against the sheriff, the court held the plaintiff liable for the debt, and gave judgment for the defendant. They said “ if the corporators were not satisfied with their individual liabilities so created, they had it in their power to cease creating them.”
 

 My conclusion is that the provision in the Constitution and in the act of 1849, which imposed upon the stockholders of banks the personal liability which was enforced by the proceedings under review, did not impair the obligation of any contract to which the appellants were parties. If this view is concurred in by my brethren, the order appealed from must be affirmed.
 

 Selden and Bacon, Js., expressed no opinion; all the other judges concurring,
 

 Judgment affirmed.