WILLIAM S. HOYT, PLAINTIFF, v. THE QUICKSILVER MINING COMPANY, GEORGE L. KENT AND OTHERS, DEFENDANTS.

GEORGE L. KENT, PLAINTIFF, v. THE QUICKSILVER MINING COMPANY AND OTHERS, DEFENDANTS.

*Corporation — right of, to issue preferred stock — who may object to*

A corporation was authorized by its charter to issue certificates of stock *representing the value of their property*, in such form and subject to such regulations as they might from time to time by their by-laws prescribe. The company bought property of the value of $10,000,000, and issued stock to that amount. Subsequently, February 24, 1870, desiring to raise money, it was resolved at an annual meeting of stockholders, by the unanimous vote of $75,658 shares, that certificates of stock, upon which five dollars per share should be paid within a time limited, should be preferred shares, and should be entitled to interest at the rate of seven per cent per annum, to be paid annually out of the net earnings of the company, any surplus remaining to be divided *pro rata* among the holders of preferred and common stock.

In pursuance of this resolution the owners of 42,913 shares of common stock exchanged them for a corresponding number of preferred shares. Since April, 1870, the capital stock has been represented by such preferred shares and the balance of the shares unexchanged of the common stock, and frequent transfers of both kinds of stock have been made, and such shares have been bought and sold in open market as common and preferred stock, the latter always at the higher price. The amount realized by the transfer of the common into the preferred shares was expended in the current expenses of the company

At the annual meeting of the stockholders, February 24, 1874, a resolution was passed authorizing the holders of the rest of the common stock to convert it, upon the payment of five dollars and interest from February 24, 1870, into preferred stock.

November 24, 1874, an action was brought by a stockholder against the company, and others, a majority of the board of directors and large owners of its common stock, in which it was decreed that the preferred stock issued under the resolution of February 24, 1870, was valid against the owners of the common stock who had assented to the preference or ratified the same, or became estopped by their acts from disputing it, and that as against such stockholders the company was bound to carry out the contract of preference. The judgment also restrained the issue of more preferred stock.

Prior to November 16, 1877, no action had been taken to restrain the issue of the preferred stock or have it declared invalid, or prevent the carrying out of the contract of preference; nor previous to the stockholders' meeting of February, 1874, was any written protest or any serious objection made to said preferred stock.

November 16, 1877, an action was brought by the holder of certain shares of common stock, asking that the preferred stock be adjudged to be void.

*Held,* that as to the parties representing the shares of stock voting in favor of the resolution giving the preference at the meeting of February 24, 1870, the preference was valid and binding.

That in respect to the holders of the balance of the common stock, their subsequent acquiescence deprived them of the right to object to such preference to the same extent that their previous assent thereto would have done.

That if such holders of the common stock had intended to raise any objections it was incumbent upon them to do so promptly, and not allow the public to deal in the preferred stock under the belief, engendered by their silence, that no objection would be made to its validity.

Though mere lapse of time will not show knowledge, yet where it would be inequitable under the circumstances of the case to allow a stockholder, after a great lapse of time, to set aside a transaction where money realized therefrom has been used by the company, it will be imputed to him.

Motion for a new trial on a case and exceptions. The case was heard by the court without a jury, and a decision rendered against the plaintiff, which decision is hereinafter more fully set forth.

The plaintiff Hoyt brought the first of the above entitled actions in his own behalf, and on behalf of all others similarly situated, who might come in and contribute to the expenses of this suit, and make themselves parties thereto against the defendant and other holders of so-called preferred stock, to determine the rights of the stockholders, and to have the invalidity of the so-called preferred stock adjudged.

From the findings of the court it appeared that the defendant, the Quicksilver Mining Company, is a corporation created by an act of the Legislature of the State of New York, entitled "an act to incorporate the Quicksilver Mining Company," passed April

10, 1866.   Pursuant to the second section of said act, the said company, at a meeting of its stockholders, duly held at the city of New York, on the 1st day of March, 1867, adopted certain by-laws, among which were the following:

\*          \*          \*          \*          \*          \*          \*

IV.  Certificates of stock, amounting to $10,000,000, shall represent the value of the property of the corporation, and the capital stock shall be divided into 100,000 shares of $100 each.

V.  The said certificate shall be in such form as shall be prescribed by the board of directors.          \*          \*          \*          \*

. XI.  No dividend shall be made except from actual surplus profits, and these profits (except a reasonable reserve fund) shall be divided as often as once in six months.   All dividends shall be payable at the office of the company in New York.

XIV.  The directors may, from time to time, on the credit and responsibility of the company, borrow such sums of money as they may deem consistent with the interests of the company, and as a security for the repayment of such loans they shall have the authority to issue notes of the company, and to pledge or mortgage any shares of stock or other estate, personal or mixed, belonging to the company.

XVI.  These by-laws may be altered, amended or repealed, at any regular or special meeting of stockholders, by a vote of a majority in interest of all the stockholders.

The capital stock authorized by the fourth by-law was issued in one certificate to William Bond, president, and George J. Forest, treasurer of the Quicksilver Mining Company, of Pennsylvania, in payment for mining property purchased of the Pennsylvania company, and for the purpose of being distributed among the holders of the stock of that company, share for share.   Said certificate was accordingly decomposed, and certificates were issued from time to time to the holders of stock of the Pennsylvania company, until at the closing of the books, prior to the annual meeting in February, 1870, only 14,864 shares remained unexchanged.

At the time of the passage of the amended by-laws and resolutions hereinafter mentioned, and the issue of certificates of preferred stock pursuant thereto, the said company was greatly embarrassed in its finances, and said measures were adopted as

well to secure the means for carrying on the corporate business as also to provide for the payment of the interest on its mortgage debt, and of judgments to a large amount, which were being enforced against it, and after various other measures, and especially a third mortgage for $1,000,000 upon the property of the company had been tried and proved unsuccessful.

At the annual meeting of the stockholders of the company, held pursuant to notice as required by the by-laws, on the 4th Wednesday (24th) of February, 1870, the following amended by-laws and resolutions were adopted by a unanimous vote of 75,658 shares :

By-law IV. Certificates of stock amounting to $10,000,000 shall represent the value of the property of the corporation, and the capital stock shall be divided into 100,000 shares of $100 each. Certificates of stock upon which five dollars ($5) per share shall be paid shall be distinguished as preferred stock.

By-law XI. The preferred stock shall be entitled to interest at the rate of seven per cent per annum from the 1st of May, 1870, to be paid annually out of the net earnings of the company for each year. Should there remain a surplus of earnings after the payment of the said interest upon the preferred stock, then this surplus shall be divided *pro rata* among the holders of preferred and common stock in proportion to their several interests.

Resolved, That a preferred stock of the company be issued in shares of $100 each, and that the treasurer be directed to open books at the office of the company in the city of New York, and to receive subscriptions to said preferred stock. Such subscriptions shall be received, only from the holders of the common stock of the company, on their surrendering to the company common stock, and paying to the treasurer five dollars on each share of stock surrendered. The common stock so surrendered shall be canceled before the issue of the preferred stock, share for share.

Resolved, That the books for subscription to the preferred stock shall be closed by the board of directors, whenever the interests of the company, in their opinion, will be promoted by so doing.

Pursuant to the resolution passed by the stockholders and board of directors, the books for subscriptions to the preferred

stock were opened on the 28th day of March, 1870, and closed upon the 18th of April following, at 3 o'clock in the afternoon. Previous to the closing of the said books, owners of common stock to the amount of 42,913 shares, subscribed for a corresponding number of shares of preferred stock, and said subscribers to the preferred stock surrendered their said shares of common stock, and paid to the company the sum of five dollars on each share so surrendered, and in consideration thereof the company thereupon issued and delivered to such common stockholders certificates of shares of said preferred stock.

Since April, 1870, of the 100,000 shares of the capital stock of the company, 42,913 shares have been represented by certificates of preferred stock, and 57,087 shares have been represented by certificates of common stock, and said two forms of certificates have been issued and continue to be issued by the said company upon the surrender of like certificates for transfer. During the said period the entire capital stock of the company, both common and preferred, has been transferred, and the certificates thereupon surrendered and new certificates issued, corresponding to those surrendered.

Since May, 1870, the stock of the Quicksilver Mining Company has been regularly called at the stock exchange in the city of New York, and there openly bought and sold in the usual manner under two designations, viz. : " Quicksilver Common " and " Quicksilver Preferred," and upon such sales the price of " Quicksilver Preferred " has always been in advance of " Quicksilver Common," and reports of such calls, purchases and sales of said stocks have been regularly made by the stock exchange and published in the daily papers in the city of New York

The sum of $214,565 realized from subscriptions to the preferred stock was appropriated by the company to the payment of its current expenses, the interest on its mortgage debt and of judgments, for which the company was liable.

At the annual meeting of the stockholders in February, 1871, the report of the president was submitted, stating that the by-laws authorizing the preferred stock were adopted at the last annual meeting by a unanimous vote of 75,658 shares, giving a complete copy of such by-laws, with a detailed statement of the amount

received for subscriptions to the preferred stock and the disbursement of the same.

At the annual meetings of the stockholders of the company, held on the 24th of February, 1874, the following preamble and resolutions were adopted by a vote of 68,274 shares in the affirmative to 2,500 in the negative :

" Whereas, at a meeting of the stockholders, held February 24, 1870, a resolution was adopted giving the privilege of conversion into preferred stock to the holders of the common stock of the company, upon the payment of five dollars per share for each share of common stock so converted, and that the option of such conversion was duly closed by the directors on the eighteenth of April following, at which time 42,913 shares of preferred stock had been issued as above provided.

" And whereas, from the report of the president, submitted to this meeting, it seems desirable that previous to the payment of dividends the same privilege of conversion should be extended to the holders of the 57,087 shares of the common stock now outstanding, it is hereby

" Resolved, That the company will issue its preferred stock to the holders of the common stock of the company, share for share, upon the surrender of such common stock, and the payment, at the time of issue, of five dollars, and interest from February 24, 1870, upon each share of stock so surrendered.

" Resolved, That the common stock so exchanged shall be canceled previous to the issue of preferred stock, share for share.

" Resolved, That the directors be hereby authorized at their option to close the books of the preferred stock for the purpose of this exchange whenever, in their judgment, the interest of the company will be promoted thereby, giving      days' notice previous thereto."

Previous to the commencement of the present suit, on or about the 16th day of November, 1877, no suit or legal proceeding of any kind was begun by any common stockholder to restrain the issue of said preferred stock, or to have the same declared invalid, or to prevent the carrying out of the contract with the preferred stockholders ; nor previous to the said meeting of stockholders in February, 1874, was any written protest or statement made in

reference to the preferred stock, nor previous to that meeting was any serious or public objection to said preferred stock ever made, or any serious or public question as to its validity raised by any stockholder.

The Quicksilver Mining Company has realized net earnings in each of the years since May 1, 1871, but neither the entire amount of such net earnings, nor their amount for any of the said years since May 1, 1871, has been definitely ascertained, nor can they be ascertained without an examination and statement of the accounts of said company, with direct reference to the determination of such amounts.

Previous to May 11, 1871, the defendant Kent was not a stockholder in the Quicksilver Mining Company. He was at the commencement of this action, and now is, the owner and holder of 2,500 shares of the preferred stock of said company, standing in his name upon its books, all of which was purchased by him at the New York stock exchange, in the usual manner of purchases at said exchange, at various times between May 11, 1871, and February 17, 1874. He purchased said stock, induced by and relying upon the terms of the certificate of preferred stock, and without any knowledge of the actual consideration upon which the preferred stock was issued.

On or about the 24th day of November, 1874, an action was brought in the Supreme Court of the State of New York, by the said George L. Kent, as plaintiff, against the said Quicksilver Mining Company and certain others, being a majority of the board of directors of said company, and large owners of its common stock, as defendants, in which the said defendants all appeared and answered, and afterwards a trial and such proceedings were had that, by the judgment of said court, duly made and entered in the office of the clerk of the city and county of New York, on the 27th day of October, 1877, it was, among other things, ordered, adjudged, and decreed that the said contract of preference made under the resolution adopted February 24, 1870, and the 42,913 shares of preferred stock issued thereunder, are valid and binding upon the said company, and upon all the stock which voted therefor, and all the other stock known as common, the holders and owners of which have subsequently

assented to such preference, or in any way ratified the same, or become estopped by their acts, or omissions to act, from disputing the same; and that said company is bound to respect and carry out the said contract of preference, as against said stock voting therefor, or subsequently assenting thereto, or ratifying the same according to the terms of said contract. The judgment recovered in the last mentioned action restrained the company from creating other preferred shares, and from paying any of its earnings on any newly issued preferred stock while the plaintiff continued to be the owner of common and preferred shares of its stock. (For the report of this case, see 12 Hun, 53.)

The plaintiff Hoyt was at the time of the commencement of the present action, and is now the owner and holder of 1,000 shares of the common stock of the Quicksilver Mining Company. He purchased said 1,000 shares of stock between October 11, 1877, and November 19, 1877, during the pendency of the suit of *Kent* v. *The Quicksilver Mining Company,* referred to in the pleadings in the action, and knew of the pendency of that suit, and of the relief sought by Kent therein. He had, prior to his purchase of said 1,000 shares of stock, been the owner and holder of preferred stock; and about the time of his aforesaid purchase he sold said preferred stock. This action was commenced November 16, 1877, and by an amended summons and complaint the said Kent was made a party defendant on November 26, 1877. His said purchase of the 1,000 shares was made with the expectation and intention of asserting, in some manner and by the aid of legal proceedings, the rights now claimed by him.

The court found, as conclusions of law, that the contract of preference authorized by the amended by-laws and resolutions adopted on the 24th of February, 1870, and contained in the certificates of preferred stock, was within the corporate powers of the Quicksilver Mining Company; that the action of the Quicysilver Mining Company in adopting said by-laws and resolutions, and issuing said certificates, was a legitimate and proper exercise of its corporate power, as the same existed under its charter; that the contract of preference being within the corporate powers of the company, and in apparent pursuance of the authority conferred by its charter, is presumptively valid; and the same not

having been objected to within a reasonable time and in a proper manner by any stockholder of the company is binding upon the company and its stockholders in favor of the defendant Kent, and all other holders of such preferred stock; that the holders of the 75,658 shares of stock who voted in favor of said amended by-laws and resolutions thereby assented to and authorized the action of the company in making said contract of preference, and said contract is valid and binding as against all owners and holders of the stock so voted upon; that the stockholders of the Quicksilver Mining Company, by acquiescing in the action of the company in making said contract of preference, and appropriating the moneys realized therefrom, have assented to and ratified said contract, and the same is binding upon them by reason of such assent and ratification; that the defendant, George L. Kent, is entitled to judgment as prayed for in his answer; and the court directed a reference for the purpose of the accounting so prayed for.

George L. Kent, November 13, 1877, commenced a second action in the Supreme Court, first judicial department, against the Quicksilver Mining Company, George D. F. Manice and other holders of the so-called "common stock," ostensibly to establish the affirmative rights of the preferred stockholders, and for an accounting and distribution of the net earnings, with preference in such distribution to the plaintiff and other preferred stockholders.

In the present action brought by Hoyt, the proceedings of Kent in his second suit were stayed, and he in turn applied for a stay against Hoyt. It was finally agreed that both actions be brought on for trial at the Special Term before Mr. Justice BARNARD, and tried at the same time.

*Thomas E. Stillman & William Allen Buttler*, for the plaintiff Hoyt. The right of the plaintiff to maintain this equitable action, for the purpose of securing the relief demanded, and the power of the court to grant such relief, are well established. (Ang. &. Ames on Corp., §§ 391, 393; *Dodge* v. *Woolsey*, 18 How. [U. S.], 331, and cases cited on page 341; *Solomons* v. *Laing*, 14 Jurist [Dec., 1850], 279; *Coleman* v. *Eastern Counties Railway Co.*, 10 Beav., 1; *Pearce* v. *Mad. and Ind. R. R. Co.*, 21 How., 441; *Bloxam* v. *Met. Railway Co.*, L. R. 3 Ch. App., 343, note. The

attempted creation by the Quicksilver Mining Company, in February, 1870, of a so-called "preferred stock," was unauthorized and illegal. (Ang. & Ames on Corp., § 393; 1 Lindley on Part. and Companies, 628; *Livingston* v. *Lynch*, 4 John. Ch., 573; *Ashbury Railway Carriage and Iron Co.* v. *Riche*, L. R., 7 Eng. and I. App., 643; *per* Malin's V. C. in *Melhado* v. *Hamilton*, 21 Week. Rep., 619; *Hutton* v. *Scarboro Cliff Co.*, 2 Drewry and Smales, 514, 521; and see opinion of Lord Ch. WESTBURY; *S. C.*, affirmed on appeal, 13 Week. Rep., 631; Brice's Ultra Vires [Green's ed.], page 147, note; and see cases cited by DANIELS, J., in *Kent* v. *Quicksilver Mining Co.*, 19 Hun, 53.) The creation of the so-called "preferred stock" cannot be upheld as an exercise of the power of the corporation to borrow money on the pledge of its net earnings. (*Taft* v. *Hartford Providence and Fishkill R. R. Co.*, 8 R. I., 310; *Williston* v. *Mich. So. and N. Ind. R. R.*, 13 Allen, 400; *Jones* v. *Terre Haute and Alton R. R. Co.*, 57 N. Y., 196; *Henry* v. *The Great Northern Railway Co.*, 1 DeGex. & J., 606, page 637.) The right of the plaintiff to maintain this action and to the relief sought thereby is not barred or affected by any assent, acquiescence or lapse of time. On the facts proved there is no question of *laches* or estoppel in the case. (Herman on Estopel, pages 415, 416, 419; *Shapley* v. *Abbott*, 42 N. Y., 443, pages 448, 449; *Knettle* v. *Newcomb*, 31 Barb., 169; *N. Y. and Oswego Midland R. R. Co.* v. *Van Horn*, 57 N. Y., 373; *Hutchins* v. *Hubbard*, 34 id., 24; *Coleman* v. *Eastern Counties Railway Co.*, 10 Beav., 1; *Miranville* v. *Silverthorne*, 48 Penn., 147; *Mechanics' Bank* v. *N. Y. and N. H. R. R. Co.*, 13 N. Y., 599; *McCready* v. *Rumsey*, 6 Duer, 574.)

*George S. Hamlin, Grosv. P. Lowrey* and *John K. Porter*, for the plaintiff and defendant Kent. By its charter the Quicksilver Mining Company was invested with a general authority to create preferred stock. (Redf. on R. [3d ed., vol. 2], 208; *Bates* v. *Androscoggin and Kennebec R.*, 49 Maine, 491; *Evansville, etc., Railway* v. *Evansville*, 15 Ind. Rep., 395; *Hazelhurst* v. *Savannah R. R.*, 43 Georgia, 53; *Lockhart* v. *Van Alstyne*, 31 Mich., 81.) The general authority conferred by the charter to create

preferred stock, and the regularity of this issue created a presumption of validity upon which subsequent purchasers had a right to rely, and which in the present position of parties cannot be questioned. (*The New York Firemen's Ins. Co.* v. *Sturges*, 2 Cow., 664; *Safford* v. *Wyckoff*, 4 Hill, 442; *Farmers' Loan and Trust Co.* v. *Perry*, 3 Sand. Ch. R., 339; *Same* v. *Clowes*, 3 Coms., 470; *Chatauqua County Bank* v *Risley*, 19 N. Y., 381; *Willmarth* v. *Crawford*, 10 Wend., 344.) Parties dealing with a corporation are bound to see that transactions upon which they rely are within the apparent authority conferred by the charter, but they are not bound to look further. (*Ritchie* v. *Ashbury R. Co.*, 9 Exch., 227; *Royal British Bk.* v. *Turquand*, 6 E. & B., 332; *Totterdell* v. *The Fareham, etc., Co.*, Eng. Law Rep. [1 C. P.], 678; *Commissioners of Knox Co., Indiana,* v. *Aspinwall et al.*, 21 How. [U. S.], 545; *Webb* v. *Herne Bay Commissioners*, Law Rep. [5 Q. B.], 642.) The acquiescence of all the stockholders rendered absolute the presumption of validity. It worked a surrender of any right which they had to object to the preferred stock, and amounted to a ratification of the action of the company in creating it. (*Cairncross* v. *Lorimer*, 7 Juris. [N. S.], 149; London Permanent Building Society, 17 W'kly Rep., 514; affirmed on App., 21 Law Times [N. S.], 8; *Parish* v. *Wheeler*, 22 N. Y., 494; *Bissell* v. *Mich. South. R. R. Co.*, id., 258; *De Groff* v. *Am. Linen Thread Co.*, 21 id., 124; *Whitney Arms Co.* v. *Barlow*, 63 id., 68; *Hazelhurst* v. *Savannah R. R. Co.*, 43 Ga., 53; *Society for Savings* v. *City of New London*, 29 Conn., 174; *Evans* v. *Smallcombe*, Law Rep. [3 H. L.], 240; *Splackman* v. *Evans*, id., 171; *Richie* v. *Ashbury Co.*, Law Rep. [7 Eng. & Irish App.], 653; *Phosphate of Lime Co.* v. *Green*, Law Rep. [7 C. & P.], 43.)

*Van Cott & Winslow*, for the Quicksilver Mining Company.

DYKMAN, J.:

It is not necessary to decide whether the resolution of February 24, 1870, directing the issue of preferred stock is *ultra vires* or not. If all the shares had been voted on at the meeting which adopted it, and had voted in the affirmative, it would have been

binding on the company, and it follows that so far as the issue of the stock was sanctioned by the 75,658 shares voting for it, it is. to that extent valid and binding now.    In respect to the holders. of the balance of the common stock, their subsequent acquiescence deprives them of the right to challenge the act, to the same extent. as their previous license would have done.    If they intended to raise any objection it was incumbent on them to do so promptly, and not allow the public to deal in the preferred stock under the belief engendered by their silence and inaction that no objection would be made against its validity ; this they failed to do, and having remained silent when equity and good conscience required. them to speak, they ought not to be permitted now to object when. equity requires them to keep silent.

It is quite true that mere lapse of time will not show knowledge of the issue of the stock in the remaining holders of the common stock, but under all the facts and circumstances of the case, such knowledge must be imputed to them, and it would be inequitable to allow them after the great lapse of time to disturb the stock. after the money raised by its sale has all been used for the benefit. of the company and cannot now be restored.

The judgment of the Special Term should be affirmed, with costs.

PRATT, J.:

In view of the fact that an immediate decision is important to the interests of both parties to this litigation, and that a failure to decide the case at this term will require a reargument in another department and much delay, I am constrained to concur in affirming the judgment of the Special Term.

GILBERT, J., dissenting.

This corporation, like every other joint stock association, presents two compacts, viz. : That between the State and the company, and that between the company and the stockholders. The primary question is whether those compacts, one or both of them, have been violated. The charter of the company authorized them "to issue certificates of stock *representing the value of their property* in such form, and.

subject to such regulations as they might from time to time by their by-laws prescribe." This provision constitutes at once a limitation of the powers of the corporation, and an agreement establishing the rights of the stockholders, and their respective interests in the corporate property. The amount of stock which the company might issue in the first instance was fixed by the value of the property then owned by them. When the company determined that the value of their property was $10,000,000, and issued stock to that amount, their power to issue stock for the time being at least was exhausted. After that act they had no power to issue more stock, except for more property purchased, and then only for the value thereof. (*Boynton* v. *Hatch*, 47 N. Y., 225; *Schenck* v. *Andrews*, 57 id., 133.) The specification of the limitation mentioned operated as an implied prohibition of the issuing of stock in excess thereof. (*People* v. *Utica Ins. Co.*, 15 Johns. R., 383–384.)

The company has made no additional purchases of property. If, therefore, the transaction which the plaintiff assails be in legal effect an issue of additional stock, it was illegal, because (1) it was not issued for property purchased, but for money advanced; and (2), because for each sum of five dollars advanced, stock amounting to $100 was issued. In determining the legal character of the transaction, we are to regard its substantive effect, and not be misled by the form in which it was clothed. The transaction was simply this. A stockholder who advanced five dollars to the corporation on each share of stock held by him received a new certificate entitling him to an annual dividend, ratably with the other stockholders, who united with him in making the advances of seven per cent of the net earnings of the corporation, and also entitling him to his previous interest as a stockholder, viz., a ratable interest in the corporate property, and a ratable share of the earnings of the corporation after deducting said dividend of seven per cent. Such is the legal effect of the certificate. The regular and formal mode of completing such a transaction would have been to give to each stockholder who made advances two certificates; one representing his interest in the earnings of the corporation only, and another representing his interest in its property, including its earnings. If the company had received

money from a stranger in payment for preferred stock of that kind, he would have received a certificate in the form first mentioned. Putting the substance of both certificates in one paper makes no difference ; for the holder of it acquired all the rights of a preferred stockholder, and at the same time retained all those of a common stockholder, excluding the dividend mentioned. In either case the amount of capital stock is increased. That part of the certificate which sets forth the preference, in legal significance, is equivalent to a separate certificate entitling the holder to the number of shares of preferred stock named in it. Each preferred stockholder, therefore, holds in legal effect two certificates, one which gives him a certain number of shares of the stock originally issued, and another, which gives him the same number of shares of preferred stock. The amount of such preferred stock issued was greatly in excess of the money received. It seems to be clear that preferred stock like that in question, assuming it to be valid, is "stock" in the technical sense of the prohibition mentioned. It entitles the holder to an exclusive interest in the earnings of the corporation in consideration of a contribution of capital. To that extent the corporation holds the property in trust for him. Although his interest will cease entirely when the corporate existence terminates, while that of the common stockholder in the corporate property will continue, yet such fact and the inequality of interest in the earnings constitues the only difference between them, and that is not a decisive one. If it were it would be equally decisive to show that the interest of the common stockholder is no longer "stock." For the right to share ratably in the earnings of a corporation is quite as essential an attribute of stock, as the right to share ratably in a division of the *corpus* of the corporate property, upon the winding up of the corporation. Ordinarily both rights are inseparable incidents of the ownership of the stock of a corporation, but either may legally exist separately from the other, and when that is the case it appropriately falls under the denomination of stock.

The proceeding for issuing the preferred stock was had without specific notice thereof. In no point of view could absent stockholders be bound without such notice, unless they waived it. It

seems to me to be a *reductio ad absurdum* to say that at a corporate meeting, held under a general notice, absent stockholders can be bound by acts which are intended to impair, and which, if valid, do impair their interests in the corporate property. It is urged that the transaction can be sustained as a means of raising money. That is only another way of saying that a corporation has power to borrow money, upon an agreement to pay for the use thereof, interest at the rate of seventy dollars a year for each sum of five dollars advanced, conditional only upon the corporation's earning so much. The answer is, that the transaction was not an exercise of the power to borrow money. If it were, a court of equity may, and should avoid it, at the instance of proper parties, as an unconscionable agreement. If such a transaction should be allowed to stand all protection of stockholders against corporate acts *ultra vires*, or fraudulent, would soon disappear.

It is also contended that the power granted to the company, to issue certificates of stock in such form, and subject to such regulations, as they might from time to time prescribe, comprehended the power of issuing preferred stock. It is unnecessary to decide whether the company possessed the power at the start of providing by its by-laws, that a portion of its original capital of $10,000,000 should be represented by certificates of stock in a form which would entitle the holder to a preference over other stockholders. But I am quite certain that the general power referred to did not authorize the company to impair the rights of stockholders, after the whole amount of stock had been issued, and the rights of the holders thereof had become vested. A stockholder in a corporation acquires an interest in the corporate property, and in the net earnings of the corporation, in proportion to the amount of stock held by him. That is the result of the compact before referred to, which exists between the corporation and the stockholders thereof. (*Hutton* v. *Scarboro Cliff Co.*, 2 Dr. & Sm., 514–521; *S. C.*, 13 W. R., 631; *Jones* v. *Terre Haute R. R. Co.*, 57 N. Y., 196–205.) The obligation of such an agreement cannot be impaired by the corporation, nor even by the Legislature, unless the right to do so has been reserved in the charter. Conceding that such right has been reserved by article 8, section 1 of the Constitution, as well as by the general provision on this subject contained in the Revised

Statutes, it has not been exercised by the Legislature, nor delegated to the corporation. Nor could it be delegated. (*Re Oliver Lee's Bank*, 21 N. Y., 9.) The stock originally issued was not restricted by any regulation that conferred authority to impair its value, by a subsequent issue of preferred stock. A power to prescribe the form in which certificates of stock shall be issued, is not a power to alter the legal effect of the contracts thereby created. In short the power referred to is one of mere regulation, and it cannot be exercised so as to take away, or impair, the obligation of a contract, or to divest a stockholder of any substantial right to, or interest in, the corporate property or in the profits which have accrued from its use. In every charter of incorporation there are fundamental provisions, and others of a general nature, which are not fundamental. Those which grant or secure rights of property must be deemed fundamental, and they cannot for that reason be violated without the stockholders consent. Modes of proceeding are regulations only, and they may be changed from time to time without his consent. Such is the power to make by-laws, to carry out the objects of the corporation, the main object thereof being to promote, not to sacrifice or injure, the interests of its stockholders.

The preference claimed by the defendant Kent, being illegal for the reasons stated, it was void in its inception. The persons who advanced their money for it acquired no advantage over the common stockholders thereby, and their transferrees stand in their shoes. (*Ashbury R'way Carriage Co.* v. *Riche*, L. R., 7 Eng. & Ir. App., 643; Ang. & Ames on Corp., § 393; 1 Lindley on Part., 628; *Livingston* v. *Lynch*, 4 Johns. Ch., 573.)

The case does not depend upon any principle of the law of agency, for no agency existed for an unlawful purpose. The corporation has agreed to do that which it cannot perform, without violating the law, and impairing the rights of the common stockholders, to whom it is bound by contract, as well as by the duty and obligation of a trustee. The law will not sanction the absurdity of compelling it to do acts for the benefit of a preferred stockholder, which would involve a breach of trust against a common stockholder, and possibly a forfeiture of its charter, and which for those reasons it might be constrained immediately to annul. The

cases which hold a corporation to its engagements, entered into through its agents, in the exercise of an apparent authority which exceeds the real authority conferred upon them, are not applicable to this case, for the reason that here the validity of the engagements does not depend upon the power of the agent, but upon that of the principal.   A man who contracts with an infant or a person under disability must abide by the incapacity of such person to do the act.   He acquires no right to enforce the contract because the infant appeared to be an adult, or the other person appeared to be free from disability.   So, where he contracts directly with a corporation, ostensibly acting through the corporate body, but which has no power to enter into the contract.

The corporation having transcended its powers by issuing the preferred stock, it may be restrained at the instance of the holders of common stock from giving effect to the act.   Every person is presumed to know the extent of the powers of a corporation with which he deals, especially if he be a stockholder thereof.   The preferred stockholders, therefore, must be held to have known, when they acquired their preference, that effect could not be given to it without a breach of trust to the holders of common stock. The same knowledge will be imputed to their transferrees.   Neither the original owners of the preferred stock, nor their transferrees, therefore, can be treated as innocent holders thereof.   To make them such, it would be necessary that it be shown that they received such stock with the acquiescence of the holders of the common stock at the time they acquired the same.   The preference was void as against the stockholders who did not assent thereto, if not *in toto*, and the right to avoid it passed with a transfer of the stock of such non-assenting stockholders.   (*McMahon* v. *Allen*, 35 N. Y., 403.)   Acquiescence, therefore, to bar an action by a holder of common stock must have arisen from his own acts or conduct, or at least from the acts or conduct of a previous holder of the same stock.   (*Bissell* v. *M. S. and N. I. R. Co.*, 22 N. Y., 258, 275.)   I am not willing to concede that evidence of the latter kind would be of any service to a preferred stockholder. But it is not necessary to decide that question, for there is no evidence in the case of any act or conduct on the part of the plaintiff Hoyt, or of any preceding holder of his stock, evincing acquies-

cence in the claims of the holders of preferred stock.    If the right to avoid the preferred stock had been cut off by acquiescence, it could have been shown when that was done, and whose acquiescence did it.    But no such evidence was given.    The only evidence of the acts of stockholders, after the preferred stock was issued, shows their dissent from the discrimination thereby created. Evidence that both common and preferred stock have been sold at the stock exchange, under those designations, amounts to nothing as proof of acquiescence, except as respects persons who are shown to have had knowledge of such sales ; nor ever then, unless it further appears that such knowledge reasonably imposed the duty of objecting on the persons to whom it was communicated. Nothing of that kind has been shown.    No knowledge of dealings in preferred stock has been brought home to anybody, nor does it appear how any person might have objected to such dealings if he had been disposed to do so.    To have cautioned the stock exchange would have been impertinent, and no means existed for making his objections known to actual purchasers of preferred stock.    It is idle, as it seems to me, to predicate acquiescence of such evidence.    Full knowledge of all material facts and circumstances, and of the rights and duties which flow from them, is essential.    (29 Gr. Ev., § 197; *Wall* v. *Cockerell*, 10 H. L. Ca., 229; *Kent* v. *Quicksilver Co.*, 12 Hun, 56.)    The burden of proof is on him who asserts the acquiescence.    Nor can a presumption of acquiescence be raised from the lapse of time.    For it appears that, as soon as the common stockholders were threatened with an actual execution by the company of the contract of preference, this action was brought, and no facts were proved, which tended to show that the holders of common stock were called upon by their own interests, or by their duty towards the holders of preferred stock to act sooner.    On the contrary, it appears that the issue of preferred stock, which occurred in April, 1870, was followed immediately by complaints of the proceeding on the part of the holders of common stock, and that such complaints continued to be made, from time to time, until November, 1874. It is a reasonable inference that the common stockholders abstained from litigation to enforce their rights, because the corporation manifested a disposition to accede to their demands, and because

the amount of the net earnings of the corporation showed that there was no immediate danger ; that any injury to them by means of the preferred stock would be actually accomplished. In November, 1874, an effort was made by the corporation to remedy the wrong complained of. A resolution was adopted, at a meeting of the corporate body, to put the holders of common stock on the same footing as the holders of preferred stock. That resolution was, however, defeated by the defendant Kent. He commenced an action against the company, and obtained an injunction which restrained the latter from carrying that resolution into effect. The questions here involved were thus put in the course of litigation, which has, in various forms, been going on ever since. I am unable to find in the case any evidence that the holders of common stock have stood by, and, by their silence, induced persons to deal in preferred stock. Indeed, such dealings do not appear to have been affected by the litigation referred to, and yet every man is presumed to be attentive to what passes in the courts of justice. (Story Eq. Jur., §§ 405–406.)

The principle of equitable estoppel is a valuable one, and should not be relaxed. But I think it would require a great stretch of that principle to render it applicable to this case. (Story Eq. Jur., §§ 1530–1550.) Nor do any of the cases which have been cited afford a precedent for an application of the doctrine of equitable estoppel to the holders of common stock before us. Nor has the period prescribed by the statute of limitations expired.

The judgment in the case of Kent against this corporation certainly is not a technical bar to this action, for neither the plaintiff nor any of the holders of common stock were parties to that judgment. Whatever was there adjudicated did not affect the plaintiff or any person under whom he claims. But I think it was there correctly adjudged that the corporation had no power to issue a fresh batch of preferred stock to the prejudice of the interests of Kent. If they had not power to do that they had not power to issue preferred stock at any time to the prejudice of the holders of common stock. Either of those acts must derive its sole support from the same grant of power.

The result of the views expressed will be to afford just pro-

tection to the holders of common stock; while at the same time no injustice will be done to the holders of preferred stock. For, although the corporation will not be permitted to carry the contract of preference into effect, they may and ought to be compelled to return the sums advanced to them in payment therefor to the holders of the preferred stock, with interest. The company had power to receive advances of money, and having used the money advanced for legitimate purposes, common honesty as well as justice requires that they shall return it. (*Whitney Arms Co.* v. *Barlow*, 63 N. Y., 62, 68–69.)

The exceptions must be allowed, and the motion for a new trial granted, with costs to abide the event.

Judgment affirmed, with costs.